UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

    v.                                  CASE NO. 5:25-cr-13-TPB-PRL

COREY WILKERSON

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

The United States of America, through the undersigned Assistant United States Attorney, responds to Defendant Corey Wilkerson's Motion to Dismiss Count One of the Indictment as Unconstitutional that was filed on October 27, 2025. Doc. 50. The indictment should not be dismissed because 18 U.S.C. § 1466A is constitutional.

### Factual Statement

Between October 20, 2023, and July 10, 2024, the defendant possessed thousands of animated depictions of sexual abuse on children. Some of the cartoon images include text describing acts of sexual violence against children that the drawings depict. The drawings are in the style of Japanese animēshon ("anime").

### 1. Japanese anime

The word anime is a shortened form of the Japanese word "animēshon," which means animation. Anime has a long history in Japan, dating back to the early 20th century. The first known anime was released in 1917, and since then, the medium has grown to become a major form of entertainment in Japan and around

the world. While this artistic style originated in Japan, its popularity led to other countries creating similar animation. Anime is known for its distinct style, which is characterized by colorful, detailed animation and unique character designs.

While anime is an artistic medium, visual representations of the sexual abuse of children are not protected as art.

**2. Anime in the defendant's possession**

On October 20, 2023, a complaint was submitted to the National Center for Missing and Exploited Children ("NCMEC"), regarding an individual uploading an image by using the internet from a cellular telephone ending in 0650 ("device"). The image appeared to be child pornography.

In April 2024, the Sumter County Sheriff's Office ("SCSO") served a search warrant to a cloud-based storage provider, known as Synchronoss Technologies, that is linked to the device. Synchronoss Technologies is headquartered in Bridgewater, New Jersey. The Verizon Synchronoss Personal Cloud transfers large data responsibly across mobile networks using links and thumbnails to reduce network traffic and lower the impact on the users' data. With the Synchronoss Personal Cloud, subscribers can access, sync and manage their content from any device running on most major mobile operating systems. Although the search warrant related to the device, due to the syncing abilities of the cloud-based storage, it is believed that any content found from the search warrant would be on other internet-based devices associated with the user of the device.

On April 11, 2024, and April 25, 2024, the SCSO received approximately

2

14,500 files of photos and videos from Synchronoss Technologies based on the search warrant. The material included cartoons in the Japanese anime style depicting graphic sexually explicit conduct involving fictional children and infants.

In May 2024, the SCSO notified the FBI of the results of the search warrant. Upon review of the material, the FBI found thousands of obscene, pornographic files including adult pornography and obscene anime of sexually explicit conduct with children and infants.

The following are examples of the thousands of files provided in the search warrant returns of the cloud-based storage provider for the device. Because the images were stored by an internet-based cloud storage provider, they have been transmitted in interstate and/or foreign commerce by means of a computer.

a. **File "20240218_100803"**

This is a color image depicting a prepubescent female. This age evaluation is based on the drawing's lack of breast development, its absence of pubic hair, and its overall size compared to the adult male drawings. The female is not wearing any clothes. Her hair is in pigtails. She is in a seated position with an adult male's erect penis inside her vagina. There are two other erect adult male penises visible in the frame. They are shown as having ejaculated on the female's face and chest. She appears to be in pain.

b. **File "20240218_222249"**

This is a color image depicting a toddler female. This age evaluation is

based on the drawing's lack of breast development, its absence of pubic hair, and its overall size compared to the adult male drawings. The female is not wearing any clothes. Her hair is in pigtails. She has a dog collar on her neck and handcuffs on her wrists. She is in a seated position. An adult male's erect penis is inside her vagina. She appears to be pain and crying.

c. **File "image_search_1692884666097"**

This is a color image depicting a female five-year-old child. This age is known as it is stated in the text portion of the cartoon. The female is sitting on an adult male's lap with the male's erect penis inserted inside the child's vagina. The child has her hands on a second adult male's thighs. The second adult male is standing in front of the child with his erect penis inserted into the child's mouth. The caption reads, "5 year old Sassie celebrates becoming a Daisy scout with her Daddy and Grandpa!"

d. **File "image_search_1692884509690"**

This is a color image depicting three scenes of two prepubescent females. This age is based on the lack of breast development, the absence of pubic hair, and overall size of the female children. The females are taking a bath with an adult male. Both children and the adult are not wearing any clothes. In the first scene, the adult male is laying in a tub of water with one of the females straddling the adult.

Their groins are touching. The second child is in the tub, as well. A caption reads, "Sassie? Can I do it too?" The second scene is of the two females talking. One of the females says to the other, "Mandy – you want to do it with Daddy too?" to which the second child responds, "Mmm-hmm! Is it OK with you?" In the third scene, the adult male is laying in a tub of water holding one of the females. The female is facing away from him in a straddle position. The adult's erect penis is touching the outside of the female's vagina. The second child is holding the adult's erect penis with one hand. The first child says, "Will it hurt?" The second child says, "It only hurts the first time but when it's inside it feels really good!"

e. **File "image_search_1710303044075"**

This is a color image depicting an adult female's torso, including her womb. Inside the womb, there is a female fetus. An adult male's erect penis is inside the adult female's vagina, and the penis extends into the female's womb and inside the fetus's vagina.

The FBI reviewed the other content collected from the April 2024 search warrant SCSO executed on Synchronoss Technologies that is linked to the device. The content included text messages from the device in which the user of the device referred to themselves as "Corey." There was a text message in which an individual addressed the user of the device as "Corey." Examples of these text messages are provided below:

    a.  On March 21, 2024, an outgoing message from the device read, "Hey, it's Corey. Just wanted to let you know I've been having some issues with my schedule at work but I will be there monday."

    b.  On February 9, 2024, an outgoing message from the device read, "Hey, it's Corey. Don't forget to let me know when there's more work."

    c.  On February 3, 2024, an incoming message to the device read, "Hi Corey, are you able to come early please."

In the FBI's review of the content collected from the April 2024 search warrant that SCSO executed on Synchronoss Technologies that is linked to a Lake Panasoffkee, Florida residence in Sumter County, in the Middle District of Florida (hereinafter "Lake Panasoffkee residence"). The content included text messages from the device in which the user of the device identified its residence as the Lake Panasoffkee residence.

A subpoena was issued to Verizon for information related to the device. The Verizon records provide that the subscriber of the device resides at Lake Panasoffkee residence. The listed subscriber is T.H. On June 24, 2024, SCSO deputies went to the Lake Panasoffkee residence, and T.H. answered the door. She advised that she lives at the Lake Panasoffkee residence with her children.

On December 6, 2023, the defendant was placed on pre-trial intervention in Sumter County for grand theft and uttering a false bank bill in case 2022CF00724. He was ordered to be on supervision in the pre-trial intervention program for thirty-six months. On June 24, 2024, a detective from the SCSO provided the FBI with a

new probation sheet for the month of June on which the defendant provided the Lake Panasoffkee residence as his current address. The Driver and Vehicle Information Database ("DAVID") also lists the Lake Panasoffkee residence as the defendant's address.

On July 1, 2024, the probation officer who is supervising the defendant on pre-trial intervention advised that on approximately June 27, 2024, the defendant changed his address to another Lake Panasoffkee residence ("premises").

### 3. Search Warrant

On July 10, 2024, the Honorable Philip R. Lammens, United States Magistrate Judge issued search warrants for the device and premises (5:24-mj-1154-PRL and 5:24-mj-1155-PRL). The FBI executed the search warrant on July 10, 2024. At approximately 9:20 A.M., FBI special agents approached the premises with the defendant's probation officer. The probation officer had previously contacted the defendant regarding a visit to see his new residence. The defendant and the owner of the premises, P.B., were present in the premises.

The defendant showed the special agents and his probation office his room in the premises and where he keeps his belongings. The special agents told the defendant the had a search warrant for the premises. The defendant and P.B. were ordered to exit the premises, and they complied. The FBI cleared the premises and conducted the search.

At approximately 11:27 A.M., they completed their search. The FBI showed the defendant a copy of the search warrant. The defendant signed the property

7

receipt showing eleven digital devices that were collected during the search, including the cellular telephone ending in 0650. The FBI transported the items collected to the FBI Ocala resident agency for storage pending transfer to the FBI Jacksonville evidence room.

The FBI forensically analyzed the devises collected during the search warrant. Two cellular telephones contained animated drawings of prepubescent females engaged in sexually explicit conduct that were saved to the camera roll on the cellular telephones. The cellular telephones were a black TCL cellular telephone and blue and black Samsung cellular telephone. The animated drawings were similar to the anime discovered on the cloud-based software from the April 2024 search warrant execution.

Additionally, there were images that were saved on the camera roll, which were generated through artificial intelligence ("AI"). These images appeared to be more realistic than the anime drawings. An example of one of the AI images is an image of a fully nude prepubescent female laying on a bed. The child's vagina is exposed in the image. A white substance that appears to be semen is present on the child's lips, face, chest, and vagina.

**4. Interview**

On July 10, 2024, at 9:30 A.M., special agents with the FBI met with the defendant, who freely and voluntarily waived his constitutional rights and agreed to speak with them. The defendant advised that he recently moved out of his family's home. He also recently got a new cellular telephone and telephone number because

his charging port was not working. He said he switched his phone to "Straight Talk," so he was no longer on his stepmother's phone plan. He said all his old cellular telephones are in a drawer in his bedroom. He said he has always been a big fan of horror, and he likes to draw it. He also likes "a lot of anime." He said he does not draw anime, saying, "I wish I could draw that good."

The special agents told the defendant that they had a cyber tip from the defendant's previous residence. They explained that cyber tips can come from different online activity, like communicating with someone or viewing something they should not. The special agents asked the defendant if he knew why they would have received a cyber tip at that residence. The defendant responded, "I mean I looked up some messed up porn, but that's about it." The special agents asked the defendant to elaborate, and he advised, "Just a dark fetishes and stuff – I don't actually act on any of it. It's just fantasy." He said he looks at "gore porn," which is "naked people getting tortured or cut up." He also viewed pornography with incestuous relationships. He said he has a "daddy-daughter" fetish. The special agents asked the defendant if he looked up the images with the purpose of masturbating to them, and he said, "Yes."

The defendant advised that all the pornography he viewed was "fake." He said all the pornography is animated and drawn. The defendant said he found the pornography on his cellular telephone through Google.com. He said he used a virtual private network ("VPN") to search the pornography, and he believed his use of the VPN kept his searches anonymous. He saved the images to his phone. The

defendant said he has "been in a bit of an endless cycle with a porn addiction since early high school."

He said he is not aware of having saved the images to anything other than his phone, but he advised that images may have been automatically saved in cloud platforms on the phone. He said no one in his previous residence knows about his pornography.

The special agents showed the defendant images that were found from the April 2024 search warrant, and he confirmed that he had previously viewed some of them. He claimed that the images were "unintentionally" viewed. He said he thought that images were "wrong" because they look like a child. He said, "I was going through a depressive stage where I was looking up stuff that was questionable, but nothing that I thought was illegal – at least not intentionally." The defendant said, "Last time I looked at my camera roll on that phone, I had close to 10,000 pictures that was porn, so there's liable to be a lot of stuff that was saved accidently. I never really went through it to check or clear anything." He said the application he views has a gallery of images that he would scroll through. The special agents asked the defendant if he ever masturbated to any of the images that included what appeared to be children, and he said, "Not intentionally." He said, "I try to avoid them as much as I can, but again I have an addiction to porn."

He confirmed his previous phone number was the cellular telephone ending in 0650. The defendant explained that his stepmother, T.H., paid for the cellular telephone plan, but he gave her money for it each month. T.H. disconnected the

service when the defendant told her that he got a new phone.

On January 21, 2025, a grand jury indicted the defendant on one count of obscene visual representations of the sexual abuse of children, in violation of 18 U.S.C. § 1466A(b).

Memorandum of Law

The defendant's motion to dismiss should be denied because 18 U.S.C. § 1466A is not unconstitutionally overbreadth, unconstitutionally vague, or unconstitutional under *Stanley v. Georgia*, 394 U.S. 557 (1969).

**1. The obscenity statute is not unconstitutionally overbreadth.**

The obscenity statute, 18 U.S.C. § 1466A, is not unconstitutionally overbreadth because the Eleventh Circuit has held the statute constitutional under the overbreadth doctrine.

The defendant carries the burden to prove a statute is unconstitutional under the overbreadth doctrine. *See Virginia v. Hicks,* 539 U.S. 113, 122 (2003). The overbreadth doctrine "prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 255 (2002). The Supreme Court describes facial invalidation for overbreadth as "strong medicine" that "has been employed by the Court sparingly and only as a last resort." *Broadrick v. Oklahoma,* 413 U.S. 601, 613 (1973). The Court has "vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep," before it may be

11

invalidated. *See Williams,* 553 U.S. at 292. The defendant must demonstrate from the text of the law and from actual fact that substantial overbreadth exists. *United States v. Ostrander*, 114 F.4th 1348, 1362 (11th Cir. 2024).

The Supreme Court established in *Miller* that obscenity is not protected by the First Amendment. *Miller v. California*, 413 U.S. 15 (1973). *Miller* limits the category of obscenity to material that meets all three requirements: (1) "the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest;" (2) the average person, applying contemporary community standards, would find that "the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by . . . law;" and (3) "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.* at 24 (internal quotations and citations omitted).

The Eleventh Circuit has upheld the constitutionality of 18 U.S.C. § 1466A. *See, e.g.*, *United States v. Dean*, 635 F.3d 1200, 1205-06 (11th Cir. 2011); *Ostrander*, 114 F.4th at 1362. The court in *Dean* held that the defendant was unable to meet his burden of demonstrating that the statute "criminalizes a substantial amount of protected expressive activity." *See id.* at 1205-06. The court discussed that "the amount of protected material prohibited by the statute pales in comparison to the statute's legitimate sweep." *Id.* The court distinguished 18 U.S.C. § 1466A from the statute at issue in *Ashcroft*, reasoning, "The statute at issue in that case had no exception for materials that were non-obscene by reason of their serious literary,

artistic, political, or scientific value, and it therefore risked suppressing a substantial

amount of protected speech if the material contained even a single instance of

graphic sexual conduct by what appeared to be a minor." *Id.*

> Because the statute targets only specific, graphic sexual activity, and because the statute targets only images that lack serious literary, artistic, political, or scientific value, the category of protected materials which are nonetheless prohibited by the statute is very narrow. By contrast, the plainly legitimate sweep of the statute is quite broad . . . As explained above, we are reasonably sure that most materials depicting graphic sexual conduct without communicating serious value would appeal to the prurient interest. And we demonstrated above that the vast majority of images prohibited by the statute satisfy not only the no serious value and prurient interest prongs of *Miller,* but also satisfy its patently offensive prong. Thus, the vast majority of images prohibited by the statute are plainly within its legitimate sweep. Dean has failed to satisfy his burden of pointing to plausible examples of protected imaged that nevertheless would be prohibited by the statute. And we can imagine only a narrow window of such materials – i.e., those using adult actors or computer models to depict older teenagers engaged in non-offensive sexual acts. Such non-offensive sexual conduct is only one of the numerous graphic sexual acts targeted by the statute, and even this category is limited because only images of older looking teenagers could escape being deemed patently offensive (as well as satisfying the other two *Miller* prongs and thus being obscene). Especially when this narrow window is measured against the plainly legitimate and broad sweep of the statute, Dean has failed to show that the statute is facially overbroad.

*Id.*

Here, the defendant's motion to dismiss should be denied because the

defendant did not meet its burden in proving 18 U.S.C. § 1466A is substantially

overbreadth. The defendant argued that the statute was unconstitutional because it

did not meet the *Miller* test. The Eleventh Circuit, however, upheld the

constitutionality of the obscenity statute by distinguishing *Ascroft* and reasoning that

the three *Miller* prongs are sufficiently covered within the obscenity statute because

(1) "it is difficult to conceive of graphic sexual material that lacks serious value yet would not appeal to the prurient interests"; (2) the court could only think of one application of the statute that would not be patently offensive (pictures of 17 year olds engaging in sexually explicit conduct); and (3) the statute explicitly requires that the work lack serious literary, artistic, political, or scientific value. *See Dean*, 635 F.3d at 1205-08.

Because the Eleventh Circuit has upheld the constitutionality of the obscenity statute, this Court should deny the defendant's motion to dismiss.

### 2. The obscenity statute is not unconstitutionally vague.

The obscenity statute, 18 U.S.C. § 1466A, is not unconstitutionally vague because the Eleventh Circuit has held the statute constitutional under the void-for-vagueness doctrine.

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). *Miller* provided a three-prong test in determining whether material is obscene. *See Miller*, 413 U.S. at 24. "*Miller* is clear in positing that the essential question is not who the intended audience is, but what the 'average person, applying contemporary community standards,' would think." *See Ostrander*, 114 F.4th at 1365 (rejecting the defendant's claim that 18 U.S.C. § 1466A is void for vagueness when applied to a person's private works maintained in his home).

Here, the defendant's motion to dismiss should be denied because 18 U.S.C. § 1466A is not unconstitutionally vague. The defendant argued that the statute is vague because drawings could depict non-humans or people who are age ambiguous. The statute under which the defendant is charged, 18 U.S.C. § 1466A(b)(1), prohibits knowingly possessing "a visual depiction of any kind, including a drawing, cartoon, sculpture, or painting, that depicts a minor engaging in sexually explicit conduct and is obscene." The defendant's argument that a person could be prosecuted under this statute for possessing an image that depicts a non-human or an age-ambiguous human fails because 18 U.S.C. § 1466A(b)(1) requires the image to be of a minor. Thus, a person cannot be prosecuted for a non-human image – unless the image depicts bestiality – and the minor's age would have to be obvious. *See* 18 U.S.C. § 1466A(b)(1). The defendant's images, for example, include fetuses, toddlers, and text noting the ages of children in the drawings.

Because the Eleventh Circuit has upheld the constitutionality of the obscenity statute, this Court should deny the defendant's motion to dismiss.

### 3.  Possession obscenity is not unconstitutional under *Stanley*.

The obscenity statute, 18 U.S.C. § 1466A, is not unconstitutional under *Stanley* because a violation of this statutes cannot include mere possession of obscene materials in someone's private home without having affected interstate commerce.

In 1969, the Supreme Court of the United States held in *Stanley* that the First Amendment prohibits making mere private possession of obscene material a crime. *See Stanley*, 394 U.S. at 1249-50. "But *Stanley's* holding was a narrow one, focusing

15

only on the possession of obscene materials in the privacy of one's home." *See United States v. Whorley*, 550 F.3d 326, 332 (4th Cir. 2008). "The Court's holding did not prohibit the government from regulating the channels of commerce." *Id.* Since Stanley, the Supreme Court of the United States has made it clear that Congress can still control the possession of obscene materials through the channels of interstate commerce. *See United States v. Reidel*, 402 U.S. 351, 354-55 (1971) (explicitly rejecting the notion that Stanley's recognition of the defendant's right to possess obscenity meant that "someone must have the right to deliver it to him" through the channels of commerce); *Smith v. United States*, 431 U.S. 291, 307 (1977) ("*Stanley* did not create a right to receive, transport, or distribute obscene material, even though it had established the right to possess the material in the privacy of the home"); *United States v. Orito*, 413 U.S. 139, 141 (1973) (holding that *Stanley's* tolerance of obscenity within the privacy of the home created no "correlative right to receive it, transport it, or distribute it"); *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 376 (1971) ("That the private user under *Stanley* may not be prosecuted for possession of obscenity in his home does not mean that he is entitled to import it from abroad free from the power of Congress to exclude noxious articles from commerce"). Through its enactment of 18 U.S.C. § 1466A, Congress prohibited possession of obscene materials when there is an affect on interstate commerce or the possession is on federal territory. 18 U.S.C. § 1466A(d) provides:

> The circumstance referred to in subsections (a) and (b) is that—
>
> (1) any communication involved in or made in furtherance of the offense

16

is communicated or transported by the mail, or in interstate or foreign commerce by any means, including by computer, or any means or instrumentality of interstate or foreign commerce is otherwise used in committing or in furtherance of the commission of the offense;

(2) any communication involved in or made in furtherance of the offense contemplates the transmission or transportation of a visual depiction by the mail, or in interstate or foreign commerce by any means, including by computer;

(3) any person travels or is transported in interstate or foreign commerce in the course of the commission or in furtherance of the commission of the offense;

(4) any visual depiction involved in the offense has been mailed, or has been shipped or transported in interstate or foreign commerce by any means, including by computer, or was produced using materials that have been mailed, or that have been shipped or transported in interstate or foreign commerce by any means, including by computer; or

(5) the offense is committed in the special maritime and territorial jurisdiction of the United States or in any territory or possession of the United States.

*Id.*

The Eleventh Circuit has upheld the constitutionality of 18 U.S.C. § 1466A under a *Stanley* challenge. *See Ostrander*, 114 F.4th at 1364 (upholding the constitutionality of 18 U.S.C. § 1466A in a case involving the possession of computer-generated images of children involved in sexual activity).

Here, the defendant's motion to dismiss should be denied because 18 U.S.C. § 1466A is constitutional under *Stanley*. Mere possession in a person's private home cannot violate this statute because 18 U.S.C. § 1466A requires an effect on interstate commerce or for the possession to be on federal territory.

Because the Eleventh Circuit has upheld the constitutionality of the obscenity statute, this Court should deny the defendant's motion to dismiss.

Conclusion

The United States respectfully requests this Honorable Court deny the defendant's motion to dismiss the indictment because 18 U.S.C. § 1466A is constitutional.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

By: _____

Hannah Watson
Assistant United States Attorney
Florida Bar No. 0123632
35 SE 1st Avenue, Suite 300
Ocala, Florida 34471
Telephone:   (352) 547-3600
Facsimile:    (352) 547-3623
E-mail: hannah.watson@usdoj.gov

**U.S. v. Corey Wilkerson**                    **Case No. 5:25-cr-13-TPB-PRL**

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Christine N. Bird, Esq.

/s/ Hannah Watson
Hannah Watson
Assistant United States Attorney
Florida Bar No. 0123632
35 SE 1st Avenue, Suite 300
Ocala, Florida 34471
Telephone:   (352) 547-3600
Facsimile:    (352) 547-3623
E-mail: hannah.watson@usdoj.gov